**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

LABARON C.,

      *Plaintiff,*                       Case No. 1:25-cv-12938

*v.*

                                   Patricia T. Morris
COMMISSIONER OF SOCIAL       United States Magistrate Judge
SECURITY,

      *Defendant.*

_____/

**MEMORANDUM OPINION AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 6, 7, 10)**

## I.    CONCLUSION

Plaintiff Labaron C.'s motion for summary judgment will be **GRANTED** (ECF Nos. 6, 7) and Defendant the Commissioner of Social Security's motion for summary judgment will be **DENIED** (ECF No. 10). The final decision of the Administrative Law Judge (ALJ) will be **VACATED** and this matter **REMANDED** for an **IMMEDIATE AWARD OF BENEFITS** pursuant to sentence four of 42 U.S.C. § 405(g).

## II.    ANALYSIS

### A.    Introduction and Procedural History

On July 14, 2022, Plaintiff applied for supplemental security income, alleging

1

he became disabled the same date.[1] (ECF No. 3-1, PageID.62).  The Commissioner initially denied Plaintiff's application on August 31, 2023, and on reconsideration on December 26, 2023.  (*Id.* at PageID.62, 157–58).  Plaintiff then requested a hearing before an ALJ, which was held on July 17, 2024.  (*Id.* at PageID.82–105).  The ALJ issued a written decision on September 16, 2024, finding Plaintiff was not disabled.  (*Id.* at PageID.59–81).  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied his request on July 18, 2025.  (*Id.* at PageID.49–53).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on September 16, 2025.  (ECF No. 1).  The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 8).  Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 6, 7, 10) as well as Plaintiff's response to the Commissioner's motion (ECF No. 11).

---

[1] Plaintiff has applied for and been denied benefits on at least two prior occasions.  (ECF No. 3-1, PageID.106–144).  The ALJ for the instant case noted: "Administrative Law Judge (ALJ) Robert V. Luetkenhaus issued an unfavorable decision on April 15, 2020, finding the claimant not disabled from January 12, 2018 through the date of the decision.  The claimant did not appeal the unfavorable decision; therefore, it became the final decision of the Commissioner, binding on all parties.  While I have considered all of the medical records, I attribute less weight to the evidence of disability prior to April 16, 2020, since the issue of disability is final up to that date.  As further discussed below, I find there has been a change in the claimant's condition since ALJ Luetkenhaus' decision." (*Id.* at PageID.62 (internal record citation omitted)).

## B.      Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified).  "[T]he threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite

3

conclusion." *Id.* (citation modified).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find

that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v),

(g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since July 14, 2022, the application date. (ECF No. 3-1, PageID.64). However, the ALJ noted that

> [t]he claimant's earnings records reflect he earned $2,492.00 in the 3rd quarter of 2023 and $6,133.00 in the 4th quarter of 2023. The average of the claimant's wages per month exceeded the substantial gainful activity limit of $1,470.00 in the 4th quarter of 2023 (20 CFR 20 CFR 416.974). The claimant did not note any special work conditions, assistance from others, special equipment, irregular hours, rest periods, lower productivity standards, or special relationships with his employers in the above positions. However, the medical record demonstrates that the claimant is capable of working and the claimant can be denied at step five of the sequential evaluation. Therefore, I will deny the claimant at that step since there has been at least one twelve-month period in which the claimant did not perform substantial gainful activity.

(*Id.* at PageID.64–65 (internal record citation omitted)).

At step two, the ALJ found the following severe impairments: seizure disorder, headaches, depression, and anxiety. (*Id.* at PageID.65). At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.*).

Next, the ALJ found Plaintiff had the RFC

to perform light work as defined in 20 CFR 416.967(b) except [he must] avoid work at unprotected heights or around dangerous moving machinery; no climbing of any ladders, ropes or scaffolds; [n]o driving in the course of employment and no use of foot controls; [he] has the ability to understand and remember simple instructions and can use judgment to make simple work related decisions; [he] has the ability for occasional changes in a routine work setting; [he can do] no work requiring a specific production rate such as assembly line work; and [he] has the ability for occasional contact with the public, coworkers and supervisors.

(*Id.* at PageID.67).

At step four, the ALJ found that Plaintiff did not have any past relevant work. (*Id.* at PageID.75).  However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform.  (*Id.* at Page.75–76).  Specifically, the ALJ found Plaintiff could perform the requirements of a retail marker (129,000 jobs in the national economy), an inspector (90,000), and a bench assembler (120,000).  (*Id.* at PageID.76).  Thus, the ALJ concluded Plaintiff was not disabled.  (*Id.*).

### E.    Administrative Record

On appeal, Plaintiff argues that the following errors warrant remand: the ALJ (1) incorrectly found that Plaintiff did not meet the requirements of Listing 11.02 for epilepsy; (2) failed to evaluate the supportability and consistency of two medical opinions; and (3) based his evaluation of Plaintiff's subjective symptoms on his lay opinion.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

On July 15, 2022, Plaintiff established care with Jamal Farooq Khattak, M.D.,

at the Henry Ford West Bloomfield Neurology Epilepsy Clinic. (ECF No. 3-1, PageID.444–45). Plaintiff could not "recall his seizures and fiance [sic] has been with him only couple of months." (*Id.* at PageID.445). Plaintiff's then-fiancée described his seizures as follows:

> Type 1: Staring, unresponsive, nonverbal, perhaps oral automatisms,
> Right hand stiff and some purposeless movements
> Duration 5 minutes or so
> Postictal: confused for a long time
> Frequency: fiance only witnessed once, patient doesn't know about his spells
>
> Type 2: nocturnal, unclear onset
> Eyes rolled back,
> Bilateral/generalized convulsions
> Lateral tongue bite
> Sometimes bladder incontinence
> Duration: 1–10 minutes
> Frequency: 2 per month
>
> He has had car accidents secondary to seizure in the past. [sic throughout]

(*Id.*). A prior provider had prescribed Plaintiff the medications Keppra, Vimpat, and Dilantin to manage his seizures. (*Id.*). Plaintiff reported side effects including dizziness and nausea (which he found tolerable) and mood swings since starting Keppra (which he said were "not significant"). (*Id.*).

Dr. Khattak noted that Plaintiff had "intractable focal epilepsy." (*Id.* at PageID.447). He explained to Plaintiff "that the best way to diagnose or rule out epileptic seizures is to capture them on video EEG monitoring." (*Id.* (emphasis

8

omitted)).    Dr. Khattak also discussed "drug resistant epilepsy" with Plaintiff, including that if continued medication trials proved ineffective, then surgery may be a treatment option for Plaintiff.  (*Id.* at PageID.447–48).  Ultimately, they agreed on the following treatment plan:

(1) "MRI of the brain using epilepsy protocol to evaluate for epileptic lesions, such as, mesial temporal sclerosis and focal cortical dysplasia."  (*Id.* at PageID.448);

(2) Arrangements were to be made for Plaintiff "to be admitted to the epilepsy monitoring unit for a presurgical evaluation."  (*Id.*); and

(3) Plaintiff's medications would be left unchanged for the time being although a couple of changes were mentioned as options.  (*Id.*).

In September 2022, Plaintiff underwent a brain MRI.  (*Id.* at PageID.450). The radiologist used images from a 2015 CT and an earlier 2022 MRI for comparison, making the following findings: "There is unchanged inferior cerebellar tonsillar ectopia with decreased mamillary pontine distance and can be seen in patients with intracranial hypotension, stable since the prior examination."  (*Id.* at PageID.450–51).

In November 2022, Plaintiff presented to an emergency department after experiencing a seizure while he was asleep, reporting

> that he woke up this morning with canker sores on his inner gums but no biting of tongue and no loss of bowel or bladder control.  He states

that he has breakthrough seizures about 3 times a week. He says that he took his Dilantin, Keppra and Vimpat as prescribed yesterday and today. His concern is that today he has been dizzy he feels nauseous and states that he was confused and had some blurry vision this morning. He endorses neck stiffness more in the left side and headache in the occipital region. He is also complaining of some tingling down his left arm. States he has had pain like this from previous seizures in his sleep and he has injured himself on [sic] did not know why. He denies any vomiting diarrhea or abdominal pain.

(*Id.* at PageID.509). The emergency physician provided the following summary:

Upon initial examination he is hemodynamically stable in no acute distress. I ordered CBC and BMP which are unremarkable. CT of his head and cervical spine was also ordered because of the patient's symptoms and showed no acute intracranial process and no fracture of the cervical spine. Patient was given a gram of Keppra for seizure prophylaxis. He was also given Zofran and Tylenol for his nausea and pain. Upon reexamination patient is feeling well. Patient is deemed appropriate for discharge.

(*Id.* at PageID.511). Plaintiff's discharge paperwork indicates that seizures can occur when a patient is not taking his medications correctly or when his medications need adjusted. (*Id.* at PageID.497).

Plaintiff followed up with Dr. Khattak on December 13, 2022, reporting that he "had a seizure yesterday due to which he feels a little dizzy." (*Id.* at PageID.532–33). Plaintiff also reported experiencing headaches about ten days each month, which lasted "from hours to [a] couple of days." (*Id.* at PageID.533). He described the headaches as throbbing and pulsating, with photophobia, nausea, and neck stiffness. (*Id.*). They were worse with sitting, standing, and at night, and required him to take ibuprofen around once a week. (*Id.*). Dr. Khattak increased Plaintiff's

dose of Vimpat and changed Keppra to Briviact, with a note that his dose of Briviact could be increased if necessary. (*Id.* at PageID.536–37).

On January 5, 2023, Plaintiff called Dr. Khattak's office to report that he was still having seizures, with his most recent occurring that morning. (*Id.* at PageID.531). Plaintiff also said "that since starting Briviact, he wakes up frequently at night." (*Id.*). A couple of hours later, a nurse called Plaintiff "regarding increasing dose of [Briviact] to 150mg twice per day." (*Id.*).

Plaintiff began treatment with Wesley Kerr, M.D. at the University of Michigan's epilepsy clinic on February 20, 2023. (*Id.* at PageID.583). Plaintiff reported seizure frequency of three to four times a week, with 80% of his seizures occurring in his sleep. (*Id.*). He could have nine or ten seizures in a day, including ones lasting longer than five minutes at a time. (*Id.*). Plaintiff had been taking Brivaracetam, Lacosamide, and Phenytoin to manage his seizures. (*Id.*). Plaintiff asked whether the following were side effects from his medications: gingival hyperplasia, depression, dizziness, diplopia, nystagmus, and eye shaking. (*Id.*). Plaintiff "was counseled about the following possible side effects of medications: cerebellar features, depression, irritability, [and] gingival hyperplasia." (*Id.*).

Plaintiff also reported experiencing depression and migraines, with his migraines occurring once or twice a week. (*Id.* at PageID.584). Neck stiffness accompanied Plaintiff's migraines and he experienced a particularly bad migraine

11

approximately once every other week.  (*Id.*).  Additionally, Plaintiff "described much difficulty getting and maintaining a job due to 'no call no shows.'  We discussed the ADA and reasonable accommodations."  (*Id.*).

Dr. Kerr's impression was that Plaintiff had "epilepsy of likely focal onset, medication resistant, without status epilepticus, with comorbid depression/anxiety." (*Id.* at PageID.586).  He further opined:

> The patient has longstanding refractory epilepsy and warrants a presurgical evaluation.  We discussed the likelihood of seizure freedom on medication alone being low, and he's scared of surgery but also wants to know answers about why he has seizures.  He knows someone who had [this surgery] and "lost their voice" from it.
>
> His last [long term monitoring (LTM)] was more than 2 years ago and those records are unavailable, so even if it was done here, I would repeat it.  The goal of LTM would be capture of 3 unclustered seizures to determine potential for multiple onsets and surgical planning.
>
> The MRI was not revealing of a focus, therefore FDG-PET is warranted for refractory epilepsy as if it was definitive and concordant with the LTM EEG results, it could avoid stereo-EEG placement before epilepsy surgery.  Other standard aspects of the presurgical evaluation here include neuropsychological testing (David Marshall), speech language pathology (Karen Kluin), and social work evaluation (Najda Robinson-Meyer).
>
> Due to family history of epilepsy in maternal grandfather, but otherwise not especially positive.  Would consider genetic testing if possible in the future.
>
> We discussed antiseizure medication modifications.  The patient does not want to change at this visit.  We discussed zonisamide briefly as an alternative to phenytoin due to exhibited cerebellar adverse effects and gingival hyperplasia related to the phenytoin.

(*Id.*).  Dr. Kerr also made a few recommendations for management of Plaintiff's migraines.  (*Id.*).

A couple of weeks later, Plaintiff underwent a pre-surgical social work evaluation with Robinson-Mayer.  (*Id.* at PageID.588, 625).  He reported depression and anxiety for which he had begun treatment with a therapist the month before.  (*Id.* at PageID.626).  He was not currently taking any medications for his mood.  (*Id.*).  While Plaintiff expressed some suicidal ideation, Robinson-Mayer opined there was no imminent risk due to Plaintiff's lack of planning and his close relationships with his aunt and young son.  (*Id.* at PageID.626–27).  Plaintiff said that he "last worked in 2022 on an assembly line for transmission and at a candy factory.  [Plaintiff] reported transportation [issues] and needing time off r/t seizures made it so he was unable to work."  (*Id.*).  Overall, Plaintiff expressed that

> [e]pilepsy has been "a total downward spiral.  I can't get anything done.
> It has destroyed my life because I couldn't get things done and it has
> gotten worse over the years."  [Plaintiff] reported he has not been able
> to care for his son, he is unable to work, unable to maintain relationships
> and he cannot trust people."  [sic]  [Plaintiff] reported "I have no social
> life.  I don't have friends anymore because I don't trust people and I
> feel people are against me and they don't follow through on things."
> [Plaintiff] lives with a friend who he considers to be family.

(*Id.* at PageID.630).

Robinson-Mayer opined there "are no psychosocial concerns that prevent [Plaintiff] from being considered for surgery."  (*Id.* at PageID.630).  She noted that Plaintiff's score on the PHQ-9 indicated moderate depression and his score on the

GAD-7 indicated moderate anxiety. (*Id.* at PageID.631).

From March 13 to March 16, 2023, Plaintiff was "admitted to the neuro-epilepsy service for continuous EEG monitoring, continuous remote cardiac monitoring and close neurologic observation for seizures. The treatment plan will include daily discussion with the inpatient epilepsy team regarding seizure medication management and EEG interpretation." (*Id.* at PageID.632–33). Plaintiff continued to report frequent seizures, with his most recent occurring on March 5. (*Id.* at PageID.632). He further reported that

> he is unaware of most events. Reports he has been told he will bite his left lip and have urinary incontinence. Witnesses have also reported full body shaking and foaming at the mouth with note of his eyes rolling back into his head. Post-ictal he will be very fatigued and have a difficult time responding to questions (word finding difficulty, speaking nonsensically). He often forgets the seizure even occurred. He has dislocated his left shoulder multiple times due to seizures and has chronic pain in that area. He is not aware of any triggers, denies aura.

(*Id.*).

During this admission, Plaintiff "had one event with dizziness, nausea, and disorientation, which was brief (<5 minutes) and was without EEG correlation. He also had an episode of teeth grinding and brief bilateral leg shaking that also had no EEG correlate. His typical seizure seminology was not captured during hospital admission." (*Id.* at PageID.638). Before discharge, Plaintiff's medications were adjusted. (*Id.*).

Plaintiff returned to Dr. Kerr on May 26, 2023, reporting it had been two days since his last seizure. (*Id.* at PageID.643). He had the seizure while asleep and knew it happened due to waking up with a tongue bite. (*Id.*). Plaintiff estimated that he woke up feeling normal four days a week and confused the other days. (*Id.*). Regardless, Plaintiff reported still waking up with headaches. (*Id.*). It was noted that "[t]he nocturnal seizure frequency is unclear because he doesn't have a bed partner." (*Id.*) Plaintiff expressed continued difficulties with anxiety and depression (with anxiety increasing since his hospitalization), and excitement about a new remote job opportunity. (*Id.*). Unfortunately, this job opportunity later turned out to be a scam. (*Id.*). Plaintiff also indicated his disinterest in surgery due to his anticipated lack of support during recovery. (*Id.* at PageID.647). To avoid potential adverse effects from Zonisamide, Plaintiff opted to switch to Cenobamate. (*Id.*).

A few days later, Plaintiff underwent a pre-surgical speech-language pathology evaluation with Kluin. (*Id.* at PageID.649). Following the evaluation, Kluin provided the following impressions:

1. Mildly impaired verbal agility skills & questionable uvula deviation to right raising possibility of left frontal involvement.

2. Brisk gag reflex bilaterally raising possibility of bilateral corticobulbar pathway involvement.

3. No motor speech disorder or dysarthria.

4. Focal language disorder or aphasia/dysphasia-fluent pattern with prominent dysnomia (nouns & verbs), impaired semantic verbal

fluency skills & prominently impaired understanding of spoken language at the complex level along with mildly impaired reading comprehension skills at the complex level, mildly impaired written spelling & written formulation skills suggesting dominant hemisphere – temporoparietal involvement; ventral pathway involvement. Despite these findings, [Plaintiff] expressed his wants, needs.

5. There was one episode of blank expression & no responsiveness to auditory input for brief period of time (approximately 4–5 seconds) – occurred during the cranial nerve exam.

(*Id.* at PageID.650–51 (numbering corrected)). Kluin recommended: "Daily implementation of the word finding strategies. Repeat evaluation following wean off Zonisamide. Follow up as per the Refractory Epilepsy Surgery Protocol." (*Id.* at PageID.651).

In July 2023, Plaintiff underwent a pre-surgical neuropsychological evaluation with Dr. Marshall. (*Id.*). Plaintiff admitted that he did not know precisely how often he had seizures because they almost always occurred while he was asleep, but "he has been told by previous partners that he gets about 3 to 4 per week." (*Id.* at PageID.652). "Prior to testing starting, he reported being very 'depressed' and began crying uncontrollably regarding his daily living, health, and future." (*Id.*). Plaintiff's interview and test results led Dr. Marshall to opine

Neuropsychological data revealed low average general intellectual functioning with slightly stronger nonverbal compared to verbal intellectual skills. Executive functioning, sustained attention, and visual spatial functioning were intact. Language functioning was variable with intact verbal fluency yet impaired visual and auditory naming. He demonstrated some low scores on measures of memory,

16

with verbal memory being worse than visual-spatial memory. Overall, neuropsychological data revealed a variable lowering of cognitive abilities compared to presumed previous optimal levels with some low scores in verbal tasks, particularly language (verbal and visual naming) and verbal memory being most prominent. Current findings suggest a relative weakness of the functions, including memory functions, mediated by the speech hemisphere (probably left hemisphere, although this patient's left handedness increases the probability of unusual language dominance). Emotional functioning revealed severe depression and anxiety which are likely contributing to day-to-day difficulties. Mental health treatment is strongly indicated including meeting with a psychiatrist and psychotherapist. He reported some suicidal thoughts and while he denied any current suicidal plan or intent this will need to be monitored closely.

(*Id.* at PageID.654).

Also that month, a new doctor started treating Plaintiff at the epilepsy clinic due to Dr. Kerr's departure from the practice. (*Id.* at PageID.655). Plaintiff expressed worries over possible neuropsychiatric side effects from his medications, including depression that was getting worse. (*Id.* at PageID.658). The examining doctor's initial assessment of Plaintiff's condition follows:

His clinical data are correct for recurrent seizures and a diagnosis of epilepsy. If he is correct, he has very frequent seizures out of sleep, described as convulsive seizures. The 1 example he provides for an event in wakefulness, 10 months ago, seems correct for a focal seizure with impairment of consciousness—he thinks from observers that perhaps his events in wakefulness also terminated convulsive seizures, but there are no good descriptions of his seizure semiology. His clinical course, EEG and imaging data do not definitively classify his epilepsy, but would be most correct for a focal epilepsy, neocortical.

No compelling risk factors for epilepsy. MR imaging is normal. He did complete long-term monitoring—this remarkable only for left temporal slowing. No EEG studies have described potentially

17

epileptogenic abnormalities.  No clinical events were recorded.  He elected to terminate this LTM admission due to irritability, and agitation—we reviewed this, and possibly this explained by his decision to stop smoking cigarettes, but also his quite heavy marijuana use (that he could not continue in hospital).

My colleagues have been evaluating him for the possibility of epilepsy surgery.  This may or may not be a reasonable option—we reviewed that the prerequisite would be 1st to record his clinical events.  If he is correct, and is having multiple convulsive seizures out of sleep every week, then this poses a clear risk to him of SUDEP.  Conversely, he infers these events based on how he feels on awakening—and perhaps is event frequency is markedly less.  We reviewed 2 options: Repeat admission for LTM, or perhaps attempting a prolonged ambulatory recording at home—an option I do not favor.  He would like readmission for LTM.  I am concerned this will simply replicate the previous problems.

What seems clear is that he has significant depression, passive suicidal ideation, difficulties of anxiety, and I doubt this is explained by his antiepileptic medicines.  He has never seen a psychiatrist.  A physician covering for his PCP did write him a prescription for Lexapro—but he was concerned, did not know this physician, and so did not start this.  I think his marijuana use is an attempt to improve these symptoms.

(*Id.* at PageID.662–63).  The doctor also provided five next steps:

1. I will request an interview with our psychiatrist Scott Winder.  I would ask for his recommendations for medicines, as well as guidance to improve the likelihood that he will be able to tolerate his next elective admission.

2. I will ask the desk to call him, to coordinate his PET scan (already ordered)

3. He will increase XCopri to 150 milligrams starting tomorrow, as already scheduled.  I said that if he has worsened dizziness, we will discontinue Vimpat and continue him only on Briviact and the new medicine.

18

4. Disability seems appropriate given his difficulties.  I am surprised he is not receive [sic] this.  I will ask our social worker to review.

5. Return to clinic already scheduled.

(*Id.* at PageID.663).

In October 2023, Plaintiff received treatment at the epilepsy clinic (*id.* at PageID.664–71) and also underwent the recommended psychiatric evaluation with Dr. Winder (*id.* at PageID.672–76).  Both these visits were consistent with Plaintiff's prior medical appointments, documenting continued seizures and depression related to his epilepsy.  (*Id.* at PageID.664–76).

Other evidence is discussed as relevant below.

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

> (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;
>
> (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;
>
> (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;
>
> (5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;
>
> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of

practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  *Id.* § 404.1520c(a).  "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."  *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.* § 404.1520c(c).

The first factor is "supportability."  For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative

21

medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

(i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews

evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered,  the new regulations provide

"articulation requirements."   The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record.   Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).   The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.  [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

24

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)     Statements that [the claimant is] or [is] not disabled, blind, able

25

to work, or able to perform regular or continuing work;

(ii)     Statements about whether or not [the claimant has] a severe impairment(s);

(iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)     Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)  Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its]

26

determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological

27

tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a).  But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled.  There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.*   Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.*  The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be

28

accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)   Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.     Argument and Analysis

#### 1.     Introduction

As stated above, Plaintiff raises three issues on appeal. He argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) incorrectly found that Plaintiff did not meet the requirements of Listing 11.02 for epilepsy; (2) failed to evaluate the supportability and consistency of two medical opinions; and (3) based his evaluation of Plaintiff's subjective symptoms on his lay opinion. The Commissioner disagrees on all points.

For the reasons explained below, the Court concludes that the ALJ erred at step three when evaluating whether Plaintiff met Listing 11.02 for epilepsy. This "error was not harmless because if the ALJ had properly analyzed step three and found the evidence Plaintiff put forth supported a finding that" he met the listing, "Plaintiff would have received benefits regardless of what the ALJ's conclusion would have been at steps four and five." *Jandt v. Saul*, No. 1:20-CV-00045, 2021

WL 467200, at *10 (W.D. Ky. Feb. 9, 2021).  Because this error warrants remand, the Court declines to address Plaintiff's other arguments on appeal.  *See id.* at *11 ("Considering the conclusion reached above, the Court declines to address Plaintiff's other challenges to the final decision of the Commissioner.").

### 2.     Listing 11.02

Plaintiff argues that the ALJ erred when evaluating whether his severe impairment of epilepsy met Listing 11.02.  This listing provides:

11.02 *Epilepsy,* documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or

2. Understanding, remembering, or applying information (see 11.00G3b(i)); or

3. Interacting with others (see 11.00G3b(ii)); or

4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

> 5. Adapting or managing oneself (see 11.00G3b(iv)); or
>
> D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
>
>> 1. Physical functioning (see 11.00G3a); or
>>
>> 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
>>
>> 3. Interacting with others (see 11.00G3b(ii)); or
>>
>> 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
>>
>> 5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02(A)–(D).

The regulations further provide that "[i]n adults, the most common potentially disabling seizure types are *generalized tonic-clonic seizures* and *dyscognitive seizures* (formerly complex partial seizures)." *Id.*, § 11.00(H)(1) (emphasis in original). Seizures falling into the first category feature "loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." *Id.*, § 11.00(H)(1)(a). While,

> *[d]yscognitive seizures* are characterized by alteration of consciousness

without convulsions or loss of muscle control.  During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur.  During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure (see 11.00H1a).

*Id.*, § 11.00(H)(1)(b) (emphasis in original).  Moreover, the regulations require "at least one detailed description of [the claimant's] seizures from someone, preferably a medical professional, who has observed at least one of [his] typical seizures.  If [the claimant] experience[s] more than one type of seizure, [SSA] require[s] a description of each type."  *Id.*, § 11.00(H)(2).

Here, after considering Listing 11.02, the ALJ found that Plaintiff did not meet or equal every requirement of the listing, explaining:

The claimant's seizure disorder fails to meet or medically equal listing 11.02 because the record fails to demonstrate generalized tonic-clonic seizures occurring at least once a month for at least 3 consecutive months or once every two 2 months for at least 4 consecutive months despite adherence to prescribed treatment; or dyscognitive seizures occurring at least once a week for at least 3 consecutive months or once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment.  Further, as discussed further below, the record does not reflect a marked limitation in one of the following: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

(ECF No. 3-1, PageID.65).  First, "[g]iven the conclusory nature of the ALJ's step three determination, is it not entirely clear what evidence the ALJ relied upon in concluding that plaintiff did not meet Listing 11.02 . . . ."  *Willette v. Comm'r of Soc.*

34

*Sec.*, No. 14-11637, 2015 WL 5559833, at *14 (E.D. Mich. Aug. 24, 2015), *report and recommendation adopted*, 2015 WL 5545718 (E.D. Mich. Sept. 18, 2015). "Thus, it seems that the ALJ did not provide adequate reasoning at step three to facilitate meaningful review by the Court." *Id.*; *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) ("In short, the ALJ needed to actually evaluate the evidence, compare it to [ ] the Listing, and give an explained conclusion, in order to facilitate meaningful review."). However, this alone is not enough to warrant remand because "[t]he Sixth Circuit has found an ALJ's conclusory findings at step three to be harmless error where the plaintiff did not put forth sufficient evidence to demonstrate that his or her impairments met or medically equaled the severity of the listing." *Willette*, 2015 WL 5559833, at *14 (collecting cases).

> Where, like here, an ALJ
>
> does not properly evaluate a listing, the Court must determine whether the record evidence raises a substantial question as to Plaintiff's ability to satisfy each requirement of the listing. Plaintiff must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing. Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

*Id.* (citation modified). "As explained in *Hart v. Soc. Sec. Comm'r*, where the ALJ has not adequately explained [his or] her step three findings, the issue becomes whether the plaintiff has raised a substantial question as to whether his seizure disorder meets or medically equals in severity the requirements of Listing 11.02 or 11.03." *Id.* (citing *Hart v. Comm'r of Soc. Sec.*, No. 2:14-CV-527, 2015 WL

4365463 (S.D. Ohio July 16, 2015), *report and recommendation adopted*, 2015 WL 5013359 (S.D. Ohio Aug. 25, 2015)).  Plaintiff has done more than raise a substantial question as to whether the record before the ALJ established he satisfied Listing 11.02, he has demonstrated there is substantial evidence that he does satisfy the listing.  What is more still, "[s]ubstantial evidence does not substantiate any other finding." *Vorhis-Deaton v. Comm'r of Soc. Sec.*, 34 F. Supp. 3d 809, 821 (S.D. Ohio 2014).

The ALJ appears to have believed the record contained no detailed descriptions of Plaintiff's seizures.  And now the Commissioner argues "the ALJ also properly found that the record did not contain the required description of seizures from someone, preferably a medical professional, who has observed at least one typical seizure."  (ECF No. 10, PageID.850).  However, the record does contain such descriptions.

The day after his alleged onset date, Plaintiff established care with Dr. Khattak.  (ECF No. 3-1, PageID.444–45).  Plaintiff's then-fiancée accompanied him to the appointment and provided the following detailed descriptions of both types of seizures she had witnessed in their few months together:

> Type 1: Staring, unresponsive, nonverbal, perhaps oral automatisms,
> Right hand stiff and some purposeless movements
> Duration 5 minutes or so
> Postictal: confused for a long time
> Frequency: fiance only witnessed once, patient doesn't know about his
> spells

36

> Type 2: nocturnal, unclear onset
> Eyes rolled back,
> Bilateral/generalized convulsions
> Lateral tongue bite
> Sometimes bladder incontinence
> Duration: 1 - 10 minutes
> Frequency: 2 per month
>
> He has had car accidents secondary to seizure in the past. [sic throughout]

(*Id.* at PageID.445).  It is unclear whether the ALJ considered these descriptions, but the Commissioner's current position suggests that he likely did not.  Regardless, it is patently false that the record contains no detailed descriptions of Plaintiff's seizures, and the ALJ should have discussed them.  *See Willette*, 2015 WL 5559833, at *15 (finding ALJ erred at step three by failing to explain why a third-party function report from plaintiff's father-in-law—wherein he described plaintiff's typical seizure pattern—was insufficient to satisfy the listing requirement).  And while it may be true that "an ALJ need not fully discuss the Step III findings so long as the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that the plaintiff did not meet the requirements for the listing," *Skinner v. Comm'r of Soc. Sec.*, No. CV 15-12368, 2016 WL 7856434, at *7 (E.D. Mich. Dec. 16, 2016), *report and recommendation adopted*, 2017 WL 227955 (E.D. Mich. Jan. 19, 2017), the ALJ's decision here does not so illustrate.  Instead, the ALJ failed to account for critical evidence that satisfies

37

the regulations' requirement that a claimant's seizures be described in detail by a third-party.

This evidence also supports Plaintiff's consistent reports to providers that he regularly experienced seizures, with most occurring while he is asleep. The second type of seizure described by Plaintiff's then-fiancée is what the regulations classify as a generalized tonic-clonic seizure. Such seizures feature "loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02(H)(1)(a). And here, Plaintiff's then-fiancée reported that Plaintiff experienced convulsions, tongue bites, and sometimes urinary incontinence while having a type-two seizure.

Importantly, Plaintiff's then-fiancée also noted that he experienced this type of seizure twice a month. To satisfy § 11.02(A), Plaintiff must have experienced a tonic-clonic seizure at least once a month for three consecutive months. *Id.*, § 11.02(A). Plaintiff's then-fiancée's report to his doctor supports his contention that he did experience type-two seizures at the required frequency. Five months later, Plaintiff presented to an emergency department seeking care due to a seizure he had while asleep. (ECF No. 3-1, PageID.509). At that time, Plaintiff estimated

he had around three seizures every week.  (*Id.*).  There is thus substantial evidence that Plaintiff experienced at least one tonic-clonic seizure a month for at least three months and it is not in dispute that Plaintiff was compliant with his medications.

During the relevant period, Plaintiff treated with Henry Ford and then Michigan's epilepsy clinics.  While providers noted that the exact nature and frequency of Plaintiff's seizures was unknown, they often adjusted Plaintiff's medications based solely on his self-reports of continued seizures.  And as Plaintiff highlights in his motion, he was generally prescribed three anti-seizure medications at a time, though the specific medications and doses were frequently changed.  Specialists for both health systems diagnosed Plaintiff's epilepsy as treatment resistant, with Dr. Khattak at Henry Ford describing it as "drug resistant" (*id.* at PageID.447–48) and Dr. Kerr at Michigan using the phrase "medication resistant" (*id.* at PageID.586).

Finally, to the extent that the Commissioner continues to rely on the absence of seizure activity captured via EEG during Plaintiff's brief inpatient stay to suggest that Plaintiff does not experience frequent seizures, such reliance is misguided.  The current regulations provide: "We do not require EEG test results; therefore, we will not purchase them.  However, if EEG test results are available in your medical records, we will evaluate them in the context of the other evidence in your case

39

record."[2]    The current regulations reflect a change from the SSA's historical position.   Before May 24, 2002, the SSA required "that an EEG be part of the documentation needed to support the presence of epilepsy."  *Hicks v. Comm'r of Soc. Sec.*, 105 F. App'x 757, 761 n.2 (6th Cir. 2004) (citing Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018, 20,019 (Apr. 24, 2002)).   "The Technical Revisions note that 'it is rare for an EEG to confirm epilepsy in its other forms for either adults or children.' "  *Id.*

While an ALJ certainly may rely on the absence of seizure activity on an EEG alongside and in conjunction with the other record evidence when making a disability determination, the lack of seizure activity during Plaintiff's three-night hospital stay does not cut against Plaintiff's credibility.  At most, Plaintiff reported experiencing seizures a few nights a week.  That leaves three or four nights where he does not.  His three-night hospital stay could have bolstered his reports if seizure activity had been captured, but it is not factually inconsistent for Plaintiff to experience seizures a few nights a week and not have a seizure for three nights.

For these and other reasons, the Court finds that the ALJ's opinion was *not* supported by substantial evidence.  The ALJ failed to properly describe and analyze evidence that cut against his findings.  Most critically he omitted any mention of the

---

[2]    https://www.ssa.gov/disability/professionals/bluebook/11.00-Neurological-Adult.htm (last accessed Apr. 7, 2026).

40

detailed descriptions of Plaintiff's seizures from his then-fiancée.  Such evidence is explicitly required by the regulations and Plaintiff carried his burden to provide it. Plaintiff treated with highly specialized physicians who independently diagnosed him with treatment resistant seizures and commonly adjusted his medications solely because of his self-reports of seizure frequency.  Ultimately, after reviewing the parties' briefs, the ALJ's decision, and the record evidence, the Court is satisfied that substantial evidence supports only one conclusion, which is that Plaintiff meets or medically equals Listing 11.02 for epilepsy and is thus disabled and entitled to benefits.

### H.    Remedy

"When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted." *Vorhis-Deaton*, 34 F. Supp. 3d at 821–22.  Indeed, sentence four of 42 U.S.C. § 405(g) provides the reviewing court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

The Sixth Circuit has held that it is appropriate to remand for an immediate award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Kim v. Comm'r of Soc.*

*Sec.*, No. 12-11694, 2013 WL 3981893, at *8 (E.D. Mich. Aug. 1, 2013) (citing *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). "This comports with the principle that 'where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game.' " *Palaghe v. Comm'r of Soc. Sec.*, No. 15-11920, 2016 WL 1714733, at *18 (E.D. Mich. Apr. 28, 2016) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citations omitted)). Thus, "[t]he Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming." *Vorhis-Deaton*, 34 F. Supp. 3d at 822.

Here, the ALJ concluded that Plaintiff did not meet or equal Listing 11.02 for epilepsy. As explained above, the Court concludes otherwise. This case is thus analogous to *Wilson v. Comm'r of Soc. Sec.*, No. 00-10285, 2002 WL 1608245 (E.D. Mich. July 16, 2002). In that case, the district court adopted the recommendation of the magistrate judge to remand for an immediate award of benefits where based on the evidence "the ALJ should have found that objective medical evidence confirmed the plaintiff's disability which met or equaled listing 1.11 dealing with lower extremity injuries." *Id.* at *2. And because the medical record undermined the ALJ's step-three finding, the court determined that there was "no further fact finding

42

that need[ed] to be performed." *Id.* at \*3; *see also Vorhis-Deaton*, 34 F. Supp. 3d at 822 (remanding for an immediate award of benefits where "the ALJ failed on the evidence and the law in finding substantial evidence that [the p]laintiff is able to engage in substantial gainful activity").

Plaintiff has demonstrated not only that the ALJ erred at step three, but also that the record establishes he met or equaled Listing 11.02 for epilepsy. There is no need to remand for further administrative proceedings in a case such as this one where the plaintiff has established he satisfies a listing's requirements and is thus entitled to benefits.

## III.   ORDER

For these reasons, Plaintiff's motion (ECF Nos. 6, 7) is **GRANTED** and the Commissioner's motion (ECF No. 10) is **DENIED**. The ALJ's decision is hereby **VACATED** and this matter **REMANDED** for an **IMMEDIATE AWARD OF BENEFITS** pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Date: April 14, 2026                                    S/PATRICIA T. MORRIS
                                                        Patricia T. Morris
                                                        United States Magistrate Judge